OPINION OF THE COURT
Vito C. Caruso, J.
The parties were divorced by judgment of the Supreme Court, Schenectady County, dated September 23, 1994. The divorce judgment provided that, by stipulation, they would share joint custody of their children, Malcolm and David (both age 12), with primary physical custody to plaintiff.[1] Defendant was to pay $349.68 biweekly in child support. In addition, he was required to pay maintenance to plaintiff in the amount of $190 per week until she remarried or until the children reached the age of 18. However, in the event plaintiff earned more than $200 per week, defendant’s maintenance obligation was to be reduced by 50 cents for every dollar she earned over that sum.
On October 31, 1996, defendant, proceeding pro se, applied to eliminate his child support and maintenance obligations due to the termination of his 11-year position as a research scientist with Health Research, Inc. (Health Research) effective October 30, 1996. A hearing was held on November 15, 1996 and at the end of the proceedings, the court temporarily modified defendant’s maintenance and child support obligations by suspending payments for November and December 1996 and reducing his obligations for the months of January, February, *613 March and April to $75 per week in maintenance and $75 per week in child support.[2] Decision was reserved on the health care issues raised and a hearing was scheduled for April 11, 1997 for further review of the situation including job search efforts by the defendant.
At the hearing, defendant himself and his witness, social worker Kenneth G. Einbinder, testified to defendant’s poor job performance while at Health Research. According to Einbinder, during the summer of 1996, defendant told him that his supervisor at work had spoken to him about his unacceptable work habits, in particular, his lateness, working on personal legal matters and matters involving an organization known as the Fathers’ Rights Association (with which defendant is actively involved) on company time and taking too much time off to pursue pro se support and custody modification proceedings and Fathers’ Rights Association business. Guidelines were set for him to follow. According to Einbinder, defendant was aware that these actions, particularly pursuing his own legal representation, were placing his job at jeopardy but indicated, in essence, that he did not care because his priority was with his children. As the sessions continued into July and August (which was just two months before his job was terminated), Einbinder noted that defendant recognized the toll of continuing to pursue more time with the children over work but continued to think that his priority was the children over his job. In addition, while defendant admitted that continuing education and after hours research might have enabled him to keep his job, he was unwilling to do so. On October 11, 1996, defendant received notice of termination. The reason recited in the termination letter was not poor job performance but rather the "lack of funds to support your specific position.”
The hearing testimony also established that since his termination six months ago, defendant is still unemployed and has done little to find work despite his sworn testimony that he is physically and mentally able to do so. His only significant effort has been sending out a total of 50-60 resumes in the local area, attending a resume writing workshop and signing up to attend a computer training workshop at a reemployment agency. Of all the resumes sent, he received only eight responses. Seven of them indicated no opportunities were available, but the eighth advised of the possibility of employment in the *614 technical sales area. Despite being told by an employment counselor that technical sales was one area in which he might be employable, defendant failed to follow up on this letter, testifying that he simply was not interested in technical sales and further did not feel he would be successful in sales. During the past six months he has not been on any job interviews, has not attended any formal job retraining classes and, despite the ineffectiveness of his resume mailings, candidly admits that he has not tried any other approach to find work, such as actively going out into the street looking for a job, making personal contact with prospective employers or contacting his college placement office. He also acknowledged that his wife, who like himself has a degree in physics, has not had any success in finding a physics-related job in the Capital District despite years of looking. He also was aware that since there are no similar electron microscopes in the Capital District there is no possibility that he will find another job in this geographical area doing the same work he did at Health Research. Despite this, he has not pursued employment opportunities in different geographic areas. He further has not applied for jobs outside the science field despite an admitted expertise in carpentry, or for any jobs which require no particular training or experience, such as sales or food service positions.
Finally, when asked how he spends a typical day, defendant was essentially unable to respond. It appears, however, that the majority of his time is spent preparing pro se legal papers for various support and custody modification applications involving the children of the marriage and trying to establish the Fathers’ Rights Association as a not-for-profit business. It also appears that the small business course which he says he has enrolled in through the reemployment agency and is to start in May or June, is primarily to assist him in furthering the not-for-profit business management of the Fathers’ Rights group. The likelihood of any paid employment with the Fathers’ Rights Association is doubtful since defendant also testified that there currently are no positions open in the association’s Capital District chapter. Furthermore, while a paid position evidently did become available recently, defendant did not apply for it stating that he did not feel competent to do the job. Defendant’s stated short-term plan is to apply for public assistance.
While the circumstances surrounding defendant’s termination from Health Research are not sufficiently developed for the court to determine that he lost his $41,000 per *615 year job through his own misconduct, the court finds that he has not made a diligent effort to find work since his layoff. As a matter of fact, his inaction and resulting unemployment stand in stark contrast to plaintiff, who, with the same degree, the same job market, the same two children and with even more custodial time than defendant, has managed to enroll in and complete a home health aide training course. She presently is a certified home health aide working 35-40 hours per week and earning $7.71 per hour. Unlike defendant, who was unable to articulate a long-term goal, plaintiffs stated goal is to obtain enough patient care experience to qualify for a physician’s assistant program. She anticipates being able to have the required experience by January 1998 and hopes to apply for enrollment in the fall of 1998. The court finds that with the same diligent effort, defendant, with his 11 years of experience in research, is capable of finding a job earning at least $25,000.
Even with a $25,000 imputed annual income, however, defendant still cannot make the maintenance and child support payments specified in the divorce judgment without experiencing financial hardship. In the judgment, maintenance is $190 per week or $9,880 annually; child support is $349.68 biweekly or $9,091.68 annually. The total, $18,971.68, is approximately 76% of defendant’s imputed income. Because of this, even with the imputed income, some modifications to both the maintenance and child support provisions are necessary.
The maintenance provision of the September 23,1994 divorce judgment is hereby modified by reducing the $190 weekly amount to $95. The remainder of the language which provides for a decrease of 50 cents for every dollar plaintiff earns over $200 per week shall remain. Since plaintiff’s gross weekly income averages $268, defendant’s current maintenance obligation under the reduced formula is $61 per week.
With regard to child support, applying the Child Support Standards Act (Domestic Relations Law § 240 [1-b]; Family Ct Act § 413 [CSSA]), as modified by the recent decision in Matter of Holmes v Holmes (— AD2d —, 1997 NY Slip Op 02062 [3d Dept, Mar. 6, 1997]), would result in a child support obligation of $19 per week, calculated as follows:
(a) The gross income of plaintiff is $17,108 ($13,936 employment income plus $3,172 maintenance). Her CSSA income is $16,042.
(b) The gross income as imputed to defendant is $25,000 and, after deducting FICA and the newly modified maintenance award he is to pay to plaintiff, his CSSA income is $19,915.
*616 (c) The parties’ combined parental income is $35,957. Plaintiff’s income represents 45% of the combined income and defendant’s income represents 55%.
(d) The parties’ basic child support obligation is $8,989. In accordance with the percentages recited above, plaintiff’s support responsibility is $4,045 and defendant’s is $4,944.
(e) Seeing as plaintiff has "physical” custody of the children 56% of the time and defendant 44% of the time, under the formulation affirmed by the Appellate Division in Matter of Holmes v Holmes (supra), plaintiff would pay 44% of her annual obligation to defendant ($1,779.80) and defendant would pay 56% of his annual obligation ($2,768.64) to plaintiff. This nets out to $988.84 annually or $19 per week.
In the court’s view, a child support award of $19 per week is unjust and inappropriate. This is so for the following reasons. First, while defendant may have "physical” custody of the children 44% of the time, the proof shows that he currently does not bear 44% of the children’s expenses. A comparison of defendant’s and plaintiff’s financial affidavits shows that, at present, defendant’s monthly expenses for the children over and above the $50 per week child support paid to plaintiff are $95.38 — $60 per month for food, $5.38 per month for school snacks and $30 per month for clothing. Plaintiff, on the other hand, arranges for the children’s health insurance ($130 per month), pays for their school lunches ($50 per month), purchases the majority of their clothes ($150 per month) and has a much larger food expense ($433 per month). Furthermore, defendant presented to the court no plan for providing and independently bearing the cost of a proportionate amount of the children’s expenses if his support obligation is reduced in accordance with the Holmes formula. Plaintiff realistically needs more than a $19 per week contribution from defendant if she is to continue to provide these necessaries.
Second, the testimony shows that the children’s needs are not totally being met with the current $50 per week net child support defendant pays. For example, both parties agreed that the children are currently in need of eye examinations. Neither party has vision care coverage for them and plaintiff testified that lack of money to pay for the exams was a problem. If plaintiff cannot provide for this necessary service with the current contribution, she certainly cannot afford it on $19 per week. Again, there was no proof that defendant has independently made any arrangements to have the exams completed.
Third, $19 per week will reduce the standard of living the children presently enjoy and have enjoyed during the mar *617 riage, in particular, their ability to continue to reside in the former marital residence. While ordinarily, this court would not view a potential change in residence as a reason to depart from the CSSA, this case presents some extraordinary circumstances. Since the divorce action was commenced, the parties’ children have had to endure many upheavals resulting from defendant’s consistently precarious situation, particularly, his having moved four times in the last five years, the recent loss of his job, being evicted from his apartment, currently living out of two rooms in someone else’s house and his financial troubles. In addition, they have also had to cope with the uncertainty brought about as a result of the many custody and support modification proceedings defendant has brought before both this court and the Family Court. In at least one of these proceedings, it was apparent that defendant had discussed the issues with the children directly since he had them write a letter to the court. Amidst all this turmoil, the only tangible thing that has remained constant in the children’s lives has been their home with plaintiff in the former marital residence and their attending the Niskayuna schools. This would be threatened if the court were to approve a $19 per week award since with that sum, plaintiffs monthly expenses, many of which (as noted above) are incurred on behalf of the children, would exceed her income by more than $450. Furthermore, the reality is that with their current incomes, neither plaintiff nor defendant would be able, on their own, to replace the former marital residence by purchasing another home in the Niskayuna school district.
In view of the foregoing, the court finds that a weekly child support obligation of $95 per week, which is what defendant’s support obligation would be without the Holmes reduction is appropriate given the children’s reasonable needs and defendant’s current imputed means. The parties are to share health care costs for the children, including the cost of health insurance, in the same percentage as their income bears to the combined parental income (i.e., 55% for defendant; 45% for plaintiff).
Accordingly, for the foregoing reasons, it is ordered that defendant’s motion to modify the maintenance, child support and medical and health provisions of the September 23, 1994 divorce judgment is granted, without costs, to the extent set forth herein, and it is further ordered that the modification is *618 to take effect the first day of May 1997 and to continue until further modified by this court or another court of competent jurisdiction.

. Defendant’s visitation rights were substantially as follows: every other weekend beginning Friday night and extending until Monday morning, every Wednesday (overnight), specified holidays and two weeks in the summer. The visitation schedule was subsequently modified by this court in June 1996 by adding the first Thursday and the third Tuesday of every month overnight to defendant’s visitation time. Defendant asserts and plaintiff does not dispute that the children spent 160 overnights with him in 1996.

. $50 of the $75 was to be paid to plaintiff; $25 was to accumulate as arrears.